James R. O'CONNER, Plaintiff,

v.

COMMONWEALTH EDISON COMPA-NY and London Nuclear Service, Inc., Defendants.

No. 88–1272.

United States District Court, C.D. Illinois.

July 23, 1992.

Jay H. Janssen, Peoria, IL, for plaintiff.

Donald E. Jose, West Chester, PA, Richard Nelson, Chicago, IL, Rex K. Linder, Peoria, IL, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MIHM, Chief Judge.

Before the court is a motion by defendants to exclude part of the testimony of plaintiff's causation expert, Dr. Karl Scheribel, and defendants' Motion for Summary Judgment based on the evidence then remaining in the case. This court grants both of defendants' motions for the reasons stated herein.

## I. INTRODUCTION TO THIS CASE

The plaintiff, James R. O'Conner ("O'Conner"), worked at a nuclear power plant and then later developed a medical condition, including bilateral cataracts, that he claims was caused by the radiation exposure that he received at the plant. He consulted with many physicians in an effort to determine whether or not he had a medical claim. He has consulted with and seen the following doctors regarding his alleged "injuries" caused by radiation: Dr. Karl Scheribel (ophthalmologist); Dr. John Nelson (ophthalmologist); Dr. Robert Reardon (ophthalmologist); Dr. Clarence Ward (ophthalmologist); Dr. William Bond (ophthalmologist); Dr. Michael Rosenberg (ophthalmologist); Dr. Ennio Rossi (internal medicine); Dr. Greg Ichtertz (pulmonary medicine); Dr. James LeGrand (internal and pulmonary medicine); Dr. Bruce McLelland (dermatology); Dr. Mark Bullock (family medicine); Dr. Edward Silberstein (radiology); Dr. Robert Chapman (psychiatry); and Dr. Robert Sadoff (psychiatry). A description of his alleged "injuries" is more fully set forth below. He filed this lawsuit in Illinois State Court on October 1, 1985.

In passing the Price–Anderson Act, Congress recognized that a nuclear incident might be caused by any number of participants in the nuclear industry beyond the actual licensee. Congress did not want quick and fair compensation to be hampered by the complications likely to ensue if multiple defendants, each with its own law firm, were actively and separately defending. In a "significant departure from normal tort law precepts," H.R.Rep. 104, 100th Cong., 1st Sess. pt. 3, at 16 (1987), Congress, through mandatory indemnification provisions, channelled all public liability to licensees, and away from non-licensees, (such as contractors like London Nuclear), who might otherwise have borne such liability under ordinary tort law. *See* 42 U.S.C. §§ 2014(t), 2014(w), 2210(a). Congress noted that "regardless of whether a commercial power plant accident was caused by actions of the licensee, the plant manufacturer, or any other party, liability would be 'channeled' to the licensee and payment would be obtained from the compensation pool funded by utilities." H.R.Rep. 104, pt. 3, at 16. The channelling provisions alter the ordinary congruence in tort law between causing and bearing liability. S.Rep. No. 218, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 1451, 1476, 1479 ("The Price Anderson System including ... the predetermined sources of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law.") Consequently, contractor London Nuclear Services cannot separately be liable to plaintiff in any manner in this case. One law firm has represented both defendants, without conflict, throughout the pendency of this action, since there can only be one liability pursuant to Price–Anderson and that liability is channeled solely through the licensee and through the financial protection provided by Price–Anderson. Any disagreements between defendants as to who might have done what wrong are irrelevant to O'Conner's claim for compensation under Price–Anderson. The only relevant issues are whether the duty owed was breached (O'Conner's exposure), and whether that exposure caused his claimed injury (causation).

### A. Procedural History

This case has a long procedural history that includes two published opinions on oth-

er issues in this case. The standard of care applicable to a radiation worker receiving an occupational radiation exposure was determined to be the federal permissible dose limits. *O'Conner v. Commonwealth Edison Company*, 748 F.Supp. 672 (C.D.Ill. 1990). The Price–Anderson Amendments Act, upon which this court's jurisdiction rests, was found to be constitutional. *O'Conner v. Commonwealth Edison Company*, 770 F.Supp. 448 (C.D.Ill.1991). This present opinion will not revisit the issues in those two prior decisions but they are incorporated as part of the court's rationale for granting summary judgment.

Only those pleadings that are pertinent to the present opinion are set forth here. This case was filed in state court on October 1, 1985. Defendants removed the case to this court pursuant to the provisions of 28 U.S.C. § 1441 and the Price–Anderson Amendments Act of 1988, 42 U.S.C. § 2210(n)(2) on September 13, 1988. On May 25, 1989, defendants filed a Motion for Summary Judgment on the grounds that there was no evidence that plaintiff had received a dose in excess of the Federal Permissible Dose Limits set forth at 10 C.F.R. § 20.101, and that there was no evidence that plaintiff's occupational radiation exposure caused any injuries to the plaintiff. Plaintiff filed his Response on July 25, 1989. Plaintiff included in his response, among other things, the deposition testimony of Dr. Karl Scheribel in which he states that *only* radiation could have caused plaintiff's cataracts, but did not include any affidavit from him that explained the basis of his causation opinion. At oral argument held on December 7, 1989, the court granted plaintiff's request to file supplemental affidavits and information regarding the basis of Dr. Scheribel's opinion. Plaintiff then filed a Notice of Compliance that included a short affidavit from Dr. Scheribel that simply listed the names of four articles that supposedly provided the scientific basis of his opinion. The articles referred to in this affidavit are discussed in detail *infra* at Section IV F.

On March 13, 1989, this court denied defendants' Motion for Summary Judgment on the grounds that a genuine issue of material fact existed as to whether plaintiff had received a dose in excess of the federal dose limits. That ruling was based upon what the court believed at the time was a reasonable inference from Dr. Scheribel's testimony that if O'Conner has radiation induced cataracts, he must have received a large dose of radiation in excess of the federal limits. On June 5, 1990, defendants filed a Motion in Limine to Exclude Dr. Scheribel From Testifying on Causation. Defendants also filed a Motion in Limine for a Determination of the Legal Duty Owed in which defendants requested that the court determine that the federal permissible dose limits set forth at 10 C.F.R. § 20.101 constituted the duty of care required of a utility operating a nuclear power plant and that a jury could not properly disregard these federal dose limits and substitute their own standards. The court granted defendants' Motion on September 26, 1990 for the reasons set forth in *O'Conner v. Commonwealth Edison Co.*, 748 F.Supp. 672 (C.D.Ill.1990) and also granted plaintiff's petition for interlocutory appeal which was then denied by the Seventh Circuit Court of Appeals. Misc. No. 90–8103 (7th Cir., Oct. 26, 1990). The court denied defendants' Motion to Exclude Dr. Scheribel on July 20, 1990.

However, on August 29, 1991, after reconsidering the issue of the admissibility of Dr. Scheribel's testimony *sua sponte*, the court entered an Order requesting "counsel to advise the court of the references in the record which bear on the admissibility of Dr. Scheribel's testimony." Specifically, the court requested plaintiff to provide more information on "exactly how many patients Dr. Scheribel has had with [radiation induced] cataracts" and "the information which provides the basis for Dr. Scheribel's opinion." Order dated December 22, 1989.

Both parties filed briefs in response to said request. Plaintiff also filed a Motion for Direction and/or Clarification requesting the court to provide plaintiff with specific information about the court's concerns regarding Dr. Scheribel's testimony. At oral argument held on January 17, 1992, the court told plaintiff's counsel that it was concerned with the admissibility of Dr.

Scheribel's testimony under Rules 702, 703, and *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Specifically, the court advised plaintiff that Dr. Scheribel seemed to have no verifiable scientific foundation for his opinion that only radiation could have caused plaintiff's cataracts. Tr. of Oral Argument, Jan. 17, 1992 at 10–11. The court further advised that Dr. Scheribel did not appear to be qualified to opine that he could diagnose radiation induced cataracts by simply looking at them, and that such an opinion is not accepted in the scientific community. *Id.* at 13–14. Finally, the court specifically warned plaintiff that if he did not supplement the record to demonstrate that Dr. Scheribel was qualified and that there was a verifiable scientific basis for Dr. Scheribel's opinion, the court would exclude him from testifying and would grant defendant's Motion for Summary Judgment since the remaining record would be insufficient to go to a jury. *Id.* at 19. Both parties then filed briefs in response to the court's comments. Plaintiff has had sufficient time and sufficient opportunity to establish the verifiable basis of his expert's opinion, if there is any, or to substitute a new expert. Upon this extensive record the court now rules.

### B. The Uncontested Facts of this Case

These uncontested facts are mostly taken from the statement of uncontested facts that both parties agreed to in the Pretrial Order. Other facts in this case can be found in the court's two prior Opinions. *See O'Conner v. Commonwealth Edison Company*, 748 F.Supp. 672 (C.D.Ill.1990); *O'Conner v. Commonwealth Edison Company*, 770 F.Supp. 448 (C.D.Ill.1991).

In September and October of 1983, when he was 43 years old, O'Conner took a job as a pipefitter at Quad Cities. At that time the plant was shut down to change fuel. This is known as a refueling outage. After passing a pre-employment physical exam, O'Conner worked 14 days in the month of September, and 17 days in the month of October, 1983.[1] Although he was actually employed as a pipefitter by Morrison Construction Company, a subcontractor at the plant, O'Conner was subject to extensive control by Commonwealth Edison as required by the NRC since this particular pipefitting work needed to be performed in an area containing radioactive materials.

When radioactive material is in an area, that area is designated as a radiation controlled area and access to the area is limited to only those radiation workers who have been specially trained to work in such an area. A worker with such training is known as a radiation worker—to distinguish him from a regular worker at the plant who does not have this training and therefore cannot enter any radiation controlled areas.

O'Conner worked as a radiation worker doing pipefitting, not as a regular worker doing pipefitting. As such, he was required to complete a radiation training course before he could enter any radiation controlled areas. After he completed the course he still could not enter any radiation controlled areas without first reading and signing in under a Radiation Work Permit, known as an RWP, which listed the actual levels of radiation in the work area and specified how the worker must dress and what radiation measuring devices the worker must wear at all times while he was in the radiation controlled area doing his work. O'Conner always obeyed these requirements. He never entered a radiation controlled area without the proper protective clothing or the proper radiation measuring instruments.

Radiation is measured in units just as distance is measured in units such as inches, yards or miles. The basic radiation units that are important in this case are known as "rem" and "millirem." One rem is equal to 1,000 millirem and conversely, one millirem is equal to one thousandth of a rem. To make these units of measurement more meaningful it is helpful to compare common doses all humans receive. The average American receives about 300 millirem per year from natural background radiation which is ubiquitous. *Caputo v. Boston Edison Co.*, 924 F.2d 11, 12 n. 1

---

1. Specifically, Mr. O'Conner worked on the following dates: September 14, 15, 16, 17, 19, 20, 22, 23, 24, 26, 27, 28, 29, 30, and October 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 17, 18, 19, and 20.

(1st Cir.1991); *Bubash v. Philadelphia Electric Co.*, 717 F.Supp. 297, 299 (M.D.Pa. 1989).

Although mankind has produced many sources of radiation, natural background remains the greatest contributor to the radiation exposure of the U.S. population today. Background radiation has three components: terrestrial radiation (external), resulting from the presence of naturally occurring radionuclides in the soil and earth; cosmic radiation (external), arising from outer space; and naturally occurring radionuclides (internal), deposited in the human body.

*Johnston v. United States*, 597 F.Supp. 374, 389 (D.C.Kan.1984) (quoting BEIR III at 37). In addition to natural background radiation, humans receive annual exposure from numerous medical sources and consumer products. For example, a routine chest x-ray gives a patient a dose of approximately 20 millirem. *Hennessy v. Commonwealth Edison Co.*, 764 F.Supp. 495, 499 (N.D.Ill.1991). Moreover, the average American will receive 6.5 rem (6,500 millirem) from medical and dental x-rays by the time he is 65. *Johnston v. United States*, 597 F.Supp. at 390. Construction materials and radium clocks provide an annual dose of about 7–9 millirem, and television sets provide an annual dose of 1 millirem. *Id.; Allen v. United States*, 588 F.Supp. 247, 328 (D.Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987); *cert. denied*, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988).

The amount of radiation to which a radiation worker is exposed is known as his dose. The dose of a radiation worker is recorded by radiation detection devices that he wears while working.

One type of radiation detection device that all nuclear workers are required to wear is known as a film badge (or TLD). It is designed to record the worker's radiation exposure and save it for a two week period of time, after which the film badge is processed and the two week dose is recorded in the worker's radiation exposure records. A second type of radiation detection device is known as a self-reading pocket dosimeter (SRPD). This device can be read at any time by looking at it. Some SRPD's read out with digital numbers like a digital watch, while others read out with a gauge like a car's speedometer. O'Conner wore a film badge and two SRPD's when he worked at Quad Cities.

O'Conner's main complaint is that he felt warm while working on the night of October 3 and therefore felt something had happened to overexpose him. O'Conner's Dep. at 34. He alleges that he subsequently learned that London Nuclear was performing a dilute chemical decontamination on the same night and consequently that procedure must have caused him to receive "excessive" radiation exposure. Plaintiff never defined what "excessive" exposure was or offered any expert testimony that his dose exceeded the federal permissible dose limits applicable to radiation workers. *O'Conner v. Commonwealth Edison Co.*, 748 F.Supp. at 675. In fact, his radiation exposure during the night of October 3, 1983 was measured at a maximum of .045 rem (45 millirem) on one of his SRPD's (the other SRPD measured .038 rem (38 millirem). His exposure for all of September and October was recorded at 1.465 rem by his film badge. It is uncontested that these does, if accurate, simply are insufficient to cause cataracts because they fall far short of the threshold exposure necessary to cause cataracts. Since the minimum dose necessary to cause cataracts is 200 rem (Aff. of Dr. George R. Merriam Jr. at ¶ 14, Section I D *infra*), a dose of .045 rem would be about 4,444 times too small to cause a cataract.

Defendants maintain that unless plaintiff can offer any credible evidence that O'Conner received a dose of 200 rem or more at one time, he cannot pass the required threshold dose in order to provide the necessary factual support for any expert opinion that radiation caused his cataracts. Defendants further contend that unless the plaintiff can offer any credible evidence that O'Conner received a dose in excess of 12 rem a year (or 3 rem in any quarter of the year) he cannot present the necessary factual basis for an expert opinion that the duty owed was violated. Plaintiff maintains that the testimony of Dr. Karl Scheribel meets both requirements.

C. Consensus Scientific Background for this Case

Radiation exposure and its effects upon humans is a very complex subject. Much background on this scientific subject can already be found in published case law. *Johnston v. United States*, 597 F.Supp. 374, 384–395 (D.Kan.1984); *Allen v. United States*, 588 F.Supp. 247, 260–329 (D.Utah 1984); *Akins v. Sacramento Municipal Utility District*, 6 Cal.App.4th 1605, 8 Cal.Rptr.2d 785 (3rd Dist.1992). This court will not repeat that published background material but will only add to it the following discussion of radiation induced cataracts.

Extensive discovery has established that there is a national and an international scientific consensus on the biological effects of ionizing radiation causing cataract formation in the lens of the eye. This scientific consensus is reflected in an exten-sive body of scientific literature and by numerous studies that have been performed by scientists seeking to prevent the development of cataracts in patients undergoing x-ray therapy involving large amounts (thousands of rem) of radiation. The four leading scientists who have pioneered such research are Drs. David G. Cogan, George R. Merriam, Jr., Arthur E. Upton and George W. Casarett.[2] Each has been studying the biological effects of radiation for decades. Their work has provided the scientific and medical basis for national and international scientific organizations such as the United Nations Committee on the Effects of Atomic Radiation ("UNSCEAR"),[3] the International Council on Radiological Protection ("ICRP"),[4] the National Council on Radiation Protection and Measurements ("NCRP")[5] and the National Academy of Sciences Committee on the Biological Effects of Ionizing Radiation ("BEIR")[6] to develop the consensus knowl-

**2.** Aff. of Dr. Apple at ¶ 5. Dr. David Apple is Professor and Chairman of the Department of Ophthalmology at the Medical University of South Carolina. He is also the author of the authoritative textbook entitled Ocular Pathology (4th ed. 1991). This is the Dr. Apple upon whom plaintiff's expert claims to rely. A review of the other sources cited by Dr. Scheribel in his affidavit reveal that they also cite these pioneers in researching radiation induced cataracts as the leading experts in this field. Thus, even plaintiff's own expert must agree with this characterization.

**3.** The United Nations Committee on the Effects of Atomic Radiation (UNSCEAR) was established by the United Nations General Assembly in 1955. The committee is made of eminent experts in the field of radiation from the international scientific community. It periodically issues Reports that summarize the main conclusions of all of the world's published scientific literature in the field. UNSCEAR, 1982 at 5. These reports of consensus science can be used to measure the validity of the claims of the litigants.

**4.** The International Commission on Radiological Protection was founded in 1928, and since 1950 has been providing general guidance on the widespread use of radiation sources. ICRP Publication 41: Nonstochastic Effects of Ionizing Radiation (1984). The ICRP is comprised of eminent international scientists who review the world's literature on issues related to the health effects of radiation and periodically publish reports containing reliable consensus science statements in this field. These reports can be used by a court to evaluate an expert's claims.

**5.** The National Council on Radiation Protection and Measurements ("NCRP") is a nonprofit corporation that was chartered by the United States Congress in 1964 to collect, analyze and disseminate information and recommendations on radiation protection and measurements and to provide a means for organizations that are concerned with the scientific aspects of radiation protection to cooperate in sharing information in the field. The Council is made up of experts who have detailed knowledge and competence in the particular area of the eighty-two scientific committees of the Council. NCRP Report Number 39: Basic Radiation Protection Criteria Report (1971). It publishes reliable consensus science reports in this field. These reports can be helpful to a court in assessing the various claims made by litigants and their experts.

**6.** The National Academy of Sciences was established by President Abraham Lincoln in 1863 to provide the federal government with the advice of the best scientific minds in this country. It has a committee specifically dedicated to the health effects of ionizing radiation that issues periodic reports containing the most recent knowledge in this field. The most recent report is "Health Effects of Exposure to Low Levels of Ionizing Radiation: 1990 ("BEIR V"). This publication is commonly known as BEIR V because it is the fifth report of the Biological Effects of Ionizing Radiation (BEIR) Committee of the National Academy of Sciences. As Judge Kelly stated in *Johnston v. United States,* 597 F.Supp. 374 (D.Kan.1984) of the BEIR Committee and BEIR V's predecessor, BEIR III:

The Court has drawn from the findings of a collection of studies known as the BEIR Com-

edge and principles on radiation induced cataracts. Since the reports of these various scientific groups are prepared entirely outside the context of ongoing litigation, they provide an unusually objective statement of the known science in this field.

This scientific consensus concludes, among other things, that *radiation induced cataracts have a characteristic appearance but are not pathognomonic.* "Pathognomonic" is the medical term for a specifically distinctive characteristic of a disease or pathologic condition on which a diagnosis can be made. (Dorland's Medical Dictionary (26th ed. 1985) at 977. *See* Aff. of Dr. Apple at ¶ 14; Aff. of Dr. Silberstein at ¶¶ 20–22; Aff. of Dr. Casarett at ¶¶ 10–11; Aff. of Dr. Cogan at ¶ 16; Aff. of Dr. Merriam at ¶¶ 25–26). This characteristic appearance is known as a posterior subcapsular cataract, because of its location in the back (posterior) part of the lens just below the capsule (subcapsular). Dorland's Medical Dictionary (26th ed. 1985) at 229. All radiation induced cataracts will be of the posterior subcapsular type (*characteristic*) but not all posterior subcapsular cataracts will be radiation induced (if it were otherwise they would be *pathognomonic*). Aff. of Dr. Cogan at ¶ 16. As we will see below, the failure to understand this distinction was one reason why Dr. Scheribel's opinion is logically flawed.

Radiation effects can be divided into acute (or nonstochastic) effects and stochastic effects. Acute effects will only occur above a certain dose threshold because they are the result of accumulated physical damage to cells. Stochastic effects theoretically can occur at any dose level because they are thought to start with a single altered cell, but the risk of the effect is related to the dose received, *i.e.*, less risk at lower dose and more risk at higher dose. Health Effects of Exposure to Low Levels of Ionizing Radiation: 1990 ("BEIR V") at

396, 398. (This book is the latest edition of a report of the National Academy of Sciences concerning radiation health effects. It is eminently authoritative. *Johnston v. United States*, 597 F.Supp. 374, 383–84 (D.Kan.1984)). Cataracts are an example of an acute effect while cancer is an example of a stochastic effect. BEIR V at 398. The scientific consensus establishes that radiation induced cataracts are an acute effect with a certain threshold: it takes a certain amount of radiation to cause a cataract (the threshold amount), and exposures below that amount simply will not cause any cataract. Aff. of Dr. Upton at ¶¶ 6, 8; Aff. of Dr. Cogan at ¶ 11–12; Aff. of Dr. Merriam at ¶ 16.

#### D. The Threshold Amount of Radiation Required to Cause Cataracts

The threshold amount of radiation necessary to cause a cataract is about 200 rem received at once or about 600 rem spread out over time. During the 1930's and 1940's large amounts (thousands of rem) of radiation (x-rays) were beamed into patients heads in order to treat a variety of medical conditions. Aff. of Dr. David G. Cogan at ¶ 7. The medical community noticed that cataracts sometimes resulted but did not know what dose level caused the cataracts and consequently how treatments could be changed to avoid the side effect of causing cataracts. Aff. of Dr. George Merriam at ¶¶ 6–7. Two ophthalmologists, one at the National Institute of Health (Dr. David Cogan) and one at Columbia Presbyterian Hospital (Dr. George Merriam) undertook very detailed scientific studies to find these answers so that unnecessary cataracts could be prevented.

Dr. David G. Cogan has studied radiation induced cataracts for 40 years. Aff. of Dr. Cogan at ¶ 4. He has published fourteen medical and scientific papers on the sub-

mittee for the purpose of definitions and indeed for much of what is ultimately concluded by the Court as reasonably probable ... The Committee personnel read as a 'Who's Who' from pertinent disciplines. The document, BEIR III ..., is the result of a massive study. The Court finds the findings of the study to be entirely persuasive and relevant in these cases.

597 F.Supp. at 383–84. The BEIR Reports are reliable authorities containing the distilled advice of scientists who have reviewed all of the eminent scientific literature in this field. It provides a yardstick by which a court can measure the validity of the various expert opinions offered by litigants.

ject, the first one in 1949 that was a study of cataracts in the Japanese who survived the two atomic bombs that ended WWII. Aff. of Dr. Cogan at ¶¶ 5–6. Based upon his extensive study of humans and animal experiments, Dr. Cogan has concluded that radiation simply does not cause cataracts unless the dose is at least 600 rem (600,000 millirem) when that dose is delivered over a period of months. Aff. of Dr. Cogan at ¶¶ 4–9. Dr. Cogan also discovered that the latency period between exposure and diagnosis is 13 years. Aff. of Dr. Cogan at ¶¶ 13–20. Dr. Cogan has examined the specific facts of this case and concluded that O'Conner's cataracts could not have been caused by his employment at Quad Cities because his dose was too small and because the latency period was too short. Aff. of Dr. Cogan at ¶¶ 21–23.

Dr. George R. Merriam, Jr. has studied radiation induced cataracts in humans and animals for 36 years. Aff. of Dr. Merriam at ¶ 8. He has published 19 medical and scientific papers on the subject. Aff. of Dr. Merriam at ¶ 9. Dr. Merriam's studies have shown that radiation does not cause cataracts unless the dose is 200 rem (200,-000 millirem) delivered all at once or 400 rem (400,000 millirem) delivered over 3 weeks to 3 months or 550 rem (550,000 millirem) delivered over more than 3 months. This last number, 550 rem, and the associated time frame would be the same as Dr. Cogan's 600 rem delivered over a period of months. Aff. of Dr. Merriam at ¶¶ 12–16. Dr. Merriam also found that the latency period between the exposure and the diagnosis of the cataract is extended with lower doses (200 to 400 rem) and with the radiation delivered over a longer period of time (many months). Aff. of Dr. Merriam at ¶ 13. For a dose of 250 rem (250,000 millirem) delivered all at once, it would be an average of 11 years and 8 months before a radiation induced cataract would appear, if one did happen to appear at all. Merriam and Focht, *A Clinical Study of Radiation Cataracts and the Relationship to Dose, the American Journal of Roentgenology, Radium Therapy and Nuclear Medicine,* at 299, Table V. He also found that a dose of 700 rem (700,000 millirem) was needed to produce

even a 50% chance of developing any cataract at all. Aff. of Dr. Merriam at ¶ 15. Thus, cataracts would not appear at doses below 200 rem and even at 700 rem, the chances would only be 50–50 that a cataract may appear, and if so, it would only appear after many years had passed from the time of exposure. Dr. Merriam has examined the specific facts of the present case (*i.e.,* a dose of .045 rem on October 3 or 1.465 rem for September, October 1983, and the 10 month latency period between exposure and first diagnosis) and concluded that radiation exposure at the Quad Cities simply could not have caused O'Conner's cataracts. Aff. of Dr. Merriam at ¶¶ 17–20.

Dr. Arthur C. Upton has been studying radiation induced injury to man and animals for 38 years and he has published four articles on radiation induced cataracts. Aff. of Dr. Upton at ¶ 3. Dr. Upton was a member of the United States Delegation to the 1977 United Nations Committee on The Effects of Atomic Radiation (UNSCEAR). Aff. of Dr. Upton at ¶ 4. The 1977 UNSCEAR Report focused on radiation carcinogenesis. The 1982 UNSCEAR Report focused on threshold effects, including cataracts. Aff. of Dr. Upton at ¶ 6. Distinguished UNSCEAR radiation scientists from all over the world studied the world's scientific literature on the subject and condensed it into a report which reflects the world scientific consensus. Aff. of Dr. Upton at ¶ 5. As to radiation induced cataracts UNSCEAR concluded:

> One of the conclusions of the present report is that at low doses and dose rates [as would be experienced occupationally] the induction of non-neoplastic effects [such as cataracts] is not observed.

UNSCEAR, 1982, at 11.

\* \* \* \* \* \*

> [T]he human lens responds to doses of ∼ 2 Gy [200 rem] in a single treatment, or ∼ 4 Gy [400 rem] when fractionated, resulting in the formation of cataract ... The extent of cataract formation, as well as the incidence, is dose dependent. Higher doses yield more progressive cataracts with greater loss of

vision. The latent period varies from 0.5 to 35 years; with an average of 2–3 years, although latency is also dose dependent ... Recent reviews ... suggest that a threshold for cataract for occupational exposure of lengthy fractionation is in the range of 6–14 Gy [600 to 1,400 rem].

UNSCEAR, 1982, at 598.

Dr. Upton also chaired The International Commission on Radiological Protection's (ICRP) task group which surveyed the world literature and wrote ICRP Publication 41: Nonstochastic Effects of Ionizing Radiation. Aff. of Dr. Upton at ¶¶ 7–8. This report was adopted by the ICRP in 1984. It concluded:

At high doses, lens opacities (cataracts) develop within months, progress rapidly, and eventually cloud the lens completely, while at lower doses the opacities may take years to develop, remain microscopic in size, and cause no scientific impairment of vision.

ICRP No. 41, at 17.

The threshold for x radiation for induction of minimally detectable lens opacities in the largest series of radiotherapy patients studied to date for such lesions (233 patients) was estimated to vary, from about 2 Gy [200 rem] in a single exposure to as much as 5.5 Gy [550 rem] when the dose was fractionated over a period of 3–13 weeks.

ICRP No. 41, at 18.

The lowest dose observed to cause a progressive cataract [such as Mr. O'Conner has] among these patients, some of whom were followed up to 35 years after irradiation, was 5 Gy [500 rem] ... From these observations, it may be inferred by extrapolation that a dose of more than 8 Gy [800 rem] of low-LET radiation [the type of radiation Mr. O'Conner received] would be required to produce a vision-impairing cataract under the highly protracted exposure conditions characteristics of occupational irradiation.

ICRP No. 41, at 18.

According to these two highly respected national and international bodies of radiation protection scientists who have sur-

veyed the world literature on the subject, if there is *any possibility* that O'Conner's dose on the night of October 3–4 were to cause a cataract that dose would have to be at least 200 rem. His daily dose was actually measured by two independent scientific devices at .045 rem and .038 rem, which is 4,444 times too low to cause a cataract. If there is *any possibility* that O'Conner's total occupational dose from September and November of 1983 were to cause a cataract, it would have to be at least 800 rem. However, his total dose was actually measured by scientific instruments to be 1.465 rem, which is about 546 times too low to cause cataracts. Yet, plaintiff's expert, Dr. Scheribel, proposes to testify that O'Conner has radiation induced cataracts, based solely upon his visual examination.

Dr. Lauriston S. Taylor is the founder of the ICRP and the National Counsel on Radiation Protection and Measurements (NCRP). Aff. of Lauriston S. Taylor at ¶ 3. He co-chaired NCRP Report Number 39: Basic Radiation Protection Criteria which was published in 1971 after a review of the world scientific literature (Aff. of Lauriston S. Taylor at ¶ 5): NCRP No. 39 concluded:

A long latent period exists between the time of the exposure and the onset of the development of cataracts. The interval varies inversely with dose, and five or more years may elapse between an exposure and the appearance of opacification. For very high doses, the interval may be reduced to months.

Cataract formations in the human being has been considered to be a "threshold phenomenon," since exposures of the order of 600 R [rem] incurred in the course of therapeutic irradiations were required to produce opacification over the period of observations. Observation of survivors of the bombings at Hiroshima and Nagasaki have to date been consistent with the thesis that large doses of radiation are required to produce vision-impairing lens opacification.

NCRP Report No. 39, at 39.

Dr. George W. Casarett was Professor Emeritus and Former Professor of Radiation Biology and Biophysics and Radiology

at the University of Rochester School of Medicine. He chaired the committee that prepared NCRP Report No. 91: Recommendations on Limits for Exposure to Ionizing Radiation (1987). It concluded:

> The specific objectives of radiation protection are: (1) to prevent, to the extent practicable, the occurrence of severe radiation induced nonstochastic diseases [such as cataracts] by adhering to dose equivalent limits that are below the apparent practical threshold dose equivalent levels [so that no such effects will ever occur in the exposed population] ...

NCRP No. 91, at 4.

\* \* \* \* \* \*

> For avoidance of nonstochastic effects [such as cataracts], the following *annual* dose equivalent limits are recommended for the occupational case: 150 mSv (15 rem) for the crystalline lens of the eye.

NCRP Report No. 91, at 26 (emphasis added).

The national scientific consensus, as reflected by the 1987 NCRP recommendations is that even if a radiation worker is allowed to receive a dose of 15 rem to his eye for each year during his occupational lifetime (which may be 40 years), he still will not be expected to develop a radiation induced cataract. Fifteen rem per year for forty years would equal a lifetime occupational dose to the eye of 600 rem, which would not be expected to cause a single cataract in workers so exposed.

Dr. Henry N. Wellman, Radiologist, served on the National Academy of Sciences Committee on the Biological Effects of Ionizing Radiation which wrote The Effects on Populations of Exposure to Low Levels of Ionizing Radiation: 1980 BEIR III. Aff. of Dr. Henry N. Wellman at ¶ 4. This committee of the United State's most knowledgeable scientists in this field also studied the world literature on radiation induced cataracts and concluded:

> The available data suggest a sigmoid dose-response relationship with an apparent threshold for lens opacification. Threshold doses in many for x-rays and gamma rays delivered in a single exposure vary from 200 to 500 rads [rem], whereas the threshold for doses fraction-

ated over periods of months is around 1,000 rads [rem].

BEIR III at 499.

The United States National Academy of Sciences (BEIR) agrees with the world scientific consensus as represented by UNSCEAR, ICRP and NCRP reports that it takes a dose of *at least* 200 rem delivered all at once or a dose of approximately 1,000 rem delivered over many months to exceed the threshold for radiation induced cataracts. Even at those large doses, less than 50 percent of the exposed individuals would develop cataracts. They are simply the *minimum* doses at which even one radiation induced cataract might appear in a group of exposed persons.

## II. THE PRESENT EVIDENTIARY ISSUE

The issue that is the subject of this present Opinion is the admissibility of certain expert opinion testimony that plaintiff would offer at trial from a trial deposition transcript. Plaintiff's causation expert, Dr. Karl Scheribel, would state:

> I know what cataracts look like when they have been induced by radiation, by what ever dosage or time of exposure there was. Radiation cataracts are [a] clinically describable and definable condition which, when present, cannot be mistaken for anything else.

Dr. Scheribel's Evidence Deposition at 69. From the court's review of all the scientific material on radiation induced cataracts, Dr. Scheribel appears to be the only doctor or scientist who will make such a statement, and it directly contradicts the consensus science that radiation induced cataracts are *not* pathognomonic. The real question then becomes should this "lone voice" be allowed to testify against the vast scientific consensus? Plaintiff maintains that the answer is "yes," and the jury, as the judge of the facts, would then determine which position has the most credibility.

Defendants maintain that this opinion is inadmissible under the Federal Rules of Evidence. Essentially, they argue that it constitutes what has become known as "junk" science. The essence of Dr. Scheri-

bel's testimony in this case is that he claims that radiation induced cataracts can be positively identified by just looking at them. Dr. Scheribel's Evidence Deposition at 69. If that is medically and scientifically true, and since we know that it takes hundreds of rem to cause a radiation induced cataract, it provides the basis for a reasonable inference that O'Conner *must* have been exposed to radiation above the federal standards in order to produce this cataract effect. Thus, Dr. Scheribel's proposed testimony is key to the plaintiff's case on duty owed as well as on causation. But defendants maintain that Dr. Scheribel's statement is medically and scientifically untrue. They point out that a valid logical conclusion cannot arise from a false premise no matter how correct the logic used to build upon the false premise.

Defendants assert this case is a classic example of "junk" science, not only failing to assist the jury as expert opinion testimony should under Rule 702, but actually misleading any juror who would hear it. Consequently, defendants maintain that Dr. Scheribel's proposed statement should not be admitted into evidence. Relying upon cross-examination to expose the error is not sufficient, defendants claim, because that mechanism relies upon an unsophisticated lay person to arbitrate complex scientific issues which they may not even comprehend. Thus, the admissibility of Dr. Scheribel's testimony becomes the focal point of the case. "The trial judge, of course, decides whether particular evidence is competent." Spaeth, *Proposed Amendments to the Federal Rules on Admissibility of Scientific Evidence, A Judge's Perspective*, 115 F.R.D. 112, 113 (1987).

## III. RESOLUTION OF THE EVIDENTIARY ISSUE IN THIS CASE

### A. Dr. Scheribel's Expertise and Opinion

Dr. Scheribel is a board certified ophthalmologist specializing in contact lenses. Dr. Scheribel's Evidence Dep. at 12. In his curriculum vitae ("CV"), Dr. Scheribel describes his work as "teaching of the fitting of hard and soft contact lenses and the problems associated with the same, teaching of external disease and attending physi-

cian at three general ophthalmology clinics." Dr. Scheribel's CV, a copy of which is attached as Exhibit A to his Evidence Deposition. He is not a radiation physicist and has not studied or performed any research in radiation physics or nuclear biology (Dr. Scheribel's Evidence Dep. at 66), or reviewed any of the relevant literature on radiation induced cataracts prior to testifying at his evidence deposition taken on June 10, 1988. Dr. Scheribel's Evidence Dep. at 63. He has not conducted any studies of the medical effects of radiation exposure on the eye (Dr. Scheribel's Evidence Dept. at 22), and has not written any books, articles, scientific papers or treatises on the effects of radiation on the eye. Dr. Scheribel's Evidence Dep. at 62. He has published only four scientific papers, and presented nearly a dozen invited lectures, eight of which were on contact lenses. Dr. Scheribel's CV. He admitted that he is not familiar with what would be considered an "excessive" amount of radiation, and was unable to explain what a "rad" was. Dr. Scheribel's Discovery Dep. at 28. Yet, it is through Dr. Scheribel that plaintiff expects to prove that his dose was too high. He could not state what medical effects a single rad to the eye would have. Dr. Scheribel's Discovery Dep. at 29. Further, Dr. Scheribel admitted that he was not familiar with the dose response curves of biological effects of radiation, was not familiar with what effect a 400 rem dose would have on the eye, and did not know what amount of radiation would be required to induce radiation cataracts. Dr. Scheribel's Evidence Dep. at 69. His total experience with radiation induced cataracts is observing only five patients who Dr. Scheribel believes had cataracts induced by radiation therapy for cancer. Dr. Scheribel's Discovery Dep. at 41–42. Since Dr. Scheribel's personal experience is that only radiation therapy has produced cataracts, he essentially admits that dose is a very crucial element and must be independently verified before a diagnosis can be made. Otherwise, there is no logic to his thought process since many, if not all, of the other patients with cataracts would have had low dose exposures from common diagnostic x-

rays. Since Dr. Scheribel claims that he has seen about 4200 patients with cataracts (Aff. of Dr. Scheribel at ¶ 2) and only five were radiation induced, his opinion, as originally given (when he admitted that he had not reviewed any medical literature), rested on less than twelve hundredths of one percent of the cataracts he has seen.

Dr. Scheribel examined the plaintiff on May 13, 1985. Dr. Scheribel's Evidence Dep. at 13. O'Conner was also examined by him on the following dates: 11/4/86; 9/8/87; and 6/10/88. Plaintiff provided Dr. Scheribel with his "medical history" stating that he "had cataracts caused by a radiation exposure in October of 1983." Dr. Scheribel's Letter to Attorney Kenneth D. Peters dated June 27, 1985. O'Conner did not reveal to Dr. Scheribel that his father also had bilateral cataracts at approximately age 40. Dr. Scheribel's Discovery Dep. at 23. Dr. Scheribel looked into O'Conner's eyes with a microscope and diagnosed him as having posterior subcapsular cataracts.

It is uncontested that O'Conner, like his father, has posterior subcapsular cataracts. Aff. of Dr. McGrath attached to Supplement to Defendants' Reply to Plaintiff's Motion in Limine to Exclude Evidence or Reference to Dr. Philip McGrath or Plaintiff's Father's Eye Condition; Dr. O'Brian's Dep. at 52–53. It is also uncontested that such cataracts can be caused by many factors including genetics and very large doses of radiation. However, Dr. Scheribel quickly leaped to the conclusion that plaintiff's cataracts could *only* have been caused by radiation exposure. Dr. Scheribel's Evidence Dep. at 27–28, 53. Dr. Scheribel based this opinion on the history given by O'Conner and upon his own erroneous belief that radiation induced cataracts have a clinically unique appearance that "cannot be mistaken for anything else."

Thus, Dr. Scheribel's proposed testimony is not that radiation can cause cataracts or that plaintiff has the type of cataracts that can be caused by radiation. Both opinions are admissible and medically valid. His challenged testimony is that *only* radiation exposure received at Quad Cities could have caused plaintiff's cataracts. Defen-

dants maintain that such testimony is not admissible under Rules 702, 703 and the *Frye* test, *supra* p. 7, because it is medically erroneous.

**B. Inference from Dr. Scheribel's Opinion on Duty Owed Issue**

This court has ruled in a prior opinion that the standard of care in this case is compliance with the federal numerical dose limits. The readings on the radiation measuring instruments which O'Conner wore establish such compliance unless there is some credible evidence that he must have received much more radiation. Plaintiff claims that since Dr. Scheribel will testify that O'Conner does have radiation induced cataracts, a jury is justified in ignoring the actual radiation measurements made at the time by the scientific instruments that he wore and substituting their belief that somehow he received hundreds of rem. Defendants maintain that Dr. Scheribel's testimony that only radiation exposure received at Quad Cities could have caused plaintiff's cataracts is inadmissible and medically invalid. Without it plaintiff has no credible evidence upon which a reasonable jury could even infer that O'Conner received a dose above the standards. Although on the surface Dr. Scheribel's opinion at issue here seems to be a causation opinion, it is also a medical opinion which serves, if admissible, as the only basis upon which the plaintiff can argue an inference of breach of the duty owed. Consequently, the opinion that is challenged here as being inadmissible is essential to both plaintiff's duty owed and causation burden of proof.

**C. The Federal Rules of Evidence**

■ A court may admit expert testimony if the subject of such testimony is beyond the knowledge of the average layman and it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *Carroll v. Otis Elevator Co.*, 896 F.2d 210 (7th Cir. 1990). An expert witness is not permitted to guess or base his opinion on surmise or conjecture. *Brown v. Chicago & North Western Transp.*, 162 Ill.App.3d 926, 936, 114 Ill.Dec. 165, 516 N.E.2d 320, 328 (1st

Dist.1987); *In Re Agent Orange Prod. Liab. Litigation*, 611 F.Supp. 1223, 1244, 1248–49 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2nd Cir.1987), *cert. denied, Lombardi v. Dow Chem. Co.*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *Johnston v. United States*, 597 F.Supp. 374 (D.Kan. 1984). A court is not bound by the mere assertions of an expert, but it must "pay special attention to expert testimony," *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir.1987), and must "look behind the expert's ultimate conclusion ... and analyze the adequacy of its foundation." *Peterson v. Sealed Air Corp.*, 1991 WL 66370, 1991 Lexis 5333 (N.D.Ill.1991) (quoting *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829 (D.C.Cir.1988)). Otherwise any case in which an expert was willing ... to [testify] "to a reasonable degree of scientific certainty" and [say] "the basis of my opinion is X, on which experts in my field reasonably rely," every case requiring expert testimony would get to the jury. If a court is not permitted to examine the basis of an expert opinion in order to rule on the admissibility of that opinion, then Rule 703 should read: "An expert may cite as the basis of his opinion anything he likes." *In re Paoli R.R. Yard PCB Litig.*, 706 F.Supp. 358, 368 (E.D.Pa. 1988), *rev'd on other grounds*, 916 F.2d 829 (3rd Cir.1990); *accord, Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 830 (D.C.Cir.1988) (whether expert's opinion has adequate basis is question of law for court), *cert. denied*, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989). *See also Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Such scrutiny is required because an expert's opinion "bears an aura of reliability and trustworthiness." It is axiomatic that summary judgment is not precluded merely because a party has produced an expert to support its position. *Peterson v. Sealed Air Corp.*, 1991 WL 66370, 1991 Lexis 5333 (N.D.Ill.1991); *Mid–State Fertilizer Co.*, 877 F.2d at 1339. *United States v. Tranowski*, 659 F.2d 750, 757 (7th Cir.1981) (quoting *United States v. Brown*, 557 F.2d 541, 556 (6th Cir.1977)). The subject of radiation and its effect on humans is complicated and not easily understood. Therefore, it is necessary to qualify would-

be experts who might otherwise obfuscate the issues and interfere with the outcome of this case. *See Akins v. Sacramento Municipal Utility District*, 6 Cal.App.4th 1605, 8 Cal.Rptr.2d 785 (3rd Dist.1992). As the Seventh Circuit has warned, "there is not much difficulty in finding a medical expert witness to testify to virtually any theory of medical causation short of the fantastic." *Stoleson v. United States*, 708 F.2d 1217, 1222 (7th Cir.1983). Judge Learned Hand observed that expert testimony creates the risk of a special type of prejudice:

> The trouble with all this is that it is setting the jury to decide, where doctors disagree. The whole object of the expert is to tell the jury, not the facts ... but general truths derived from his specialized experience. But how can the jury judge between two statements each founded upon an experience confessedly foreign in kind to their own? It is just because they are incompetent for such a task that the expert is necessary at all.

*Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1112 n. 10 (5th Cir.1991), *petition for cert. denied*, —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), (quoting Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv.L.Rev. 40, 53 (1901)).

Federal Rules of Evidence 702 and 703 provide courts with the means to screen carefully the qualifications, and factual and scientific bases of an expert's opinion. *Lundy*, 809 F.2d at 395. A court has broad discretion to exclude an expert's opinion if it cannot withstand the requirements of Rules 702 and 703. *Twin Disc, Inc. v. Big Bud Tractor*, 772 F.2d 1329 (7th Cir.1985) (court has broad discretion to assess admissibility of expert testimony); *Contractor Utility Sales Co. v. Certainteed Corp.*, 748 F.2d 1151, 1155 (7th Cir. 1984) (same). The Federal Rules of Evidence allow a court to intercede and to limit expert testimony where a witness attempts to give an opinion on a subject for which he is not qualified, when there is no factual basis for that proffered opinion, when that opinion is based upon an error of logic, and when the expert cannot supply the court

with any verifiable scientific support for the opinion. The Rules recognize that there is some limit to every expert's expertise and that he can not be allowed to go beyond it. For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty. Indeed, a medical doctor who is quick to proclaim general and universally binding principles based on his or her own very limited knowledge or experience in the precise medical issue in question is more likely to mislead a jury than to help them find the truth. In science, a proposition is not true just because one claiming to be an "expert" is willing to make such a statement. In law, a statement is not admissible just because a self-proclaimed "expert" is willing to say it on the witness stand. Scientific truths must be verifiable or they are not *scientific* truths at all. An expert's opinion must also be verifiable or it is not *expert* at all. Rules of both science and evidence require a scientist or an expert to have a verifiable scientific basis for his opinion. Such controls are important in both fields to minimize error due to "junk" science.

### D. Rule 702

■ An expert witness must be qualified by specialized "knowledge, skill, experience, training or education." Fed.R.Evid. 702; *Carroll v. Otis Elevator Co.*, 896 F.2d at 212. However, an "expert's opinion is helpful only to the extent that expert draws on some special skill, knowledge, or experience to formulate that opinion." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991).[7] District courts must ensure that expert opinion testimony is in fact *expert opinion*, "(that is, an opinion

informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id. See also Lundy*, 809 F.2d at 396 (7th Cir.1987). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Otis Elevator Co.*, 896 F.2d at 212; *Jurka v. Commonwealth Edison Co.*, No. 88 C 7852 Transcript of Proceedings at 5 (N.D.Ill., Aug. 9, 1990) (summary judgment appropriate because plaintiff had an "unqualified expert who relies upon an insupportable theory of causation"). A medical degree "alone does not qualify [an expert] to give an opinion on every conceivable medical question." *Christophersen*, 939 F.2d at 1113.[8]

O'Conner intends that Dr. Scheribel would give to the jury at trial an opinion in the unique, sophisticated and highly specialized field of radiation induced cataracts, and yet Dr. Scheribel does not qualify as an expert in this field through personal experience, specific education or even study of the relevant literature. In short, Dr. Scheribel's opinion that radiation cataracts are pathognomonic is not based on any special skill, knowledge, research or experience. He admitted in deposition that he never studied or performed research in radiation physics, that he has never conducted any studies on the medical effects of radiation on the eye, that he did not know the threshold dose required to induce cataracts and that he did not even have a rudimentary knowledge of the dose response curves for the effects of radiation. Dr. Scheribel's Evidence Dep. at 22, 62, 66, 69.

---

7. Illinois state law is in accord. *See Broussard v. Huffman Mfg. Co.*, 108 Ill.App.3d 356, 63 Ill.Dec. 854, 858, 438 N.E.2d 1217, 1221 (1982) (expert's testimony must be on questions coming within his field of training or expertise); *See e.g., People v. Huddleston*, 176 Ill.App.3d 18, 125 Ill.Dec. 606, 615, 530 N.E.2d 1015, 1024 (1988) ("the degree and manner of knowledge and experience that is required of the alleged expert is directly related to the complexity of the subject and the corresponding likelihood of error by one insufficiently familiar therewith").

8. Illinois state law is in agreement. *See Harris v. Granite City*, 52 Ill.App.3d 782, 8 Ill.Dec. 648, 651, 365 N.E.2d 1034, 1037 (1977) ("A witness is not qualified as an expert merely because he is employed in a certain capacity or engaged in a particular occupation. Mere observation ... is not enough unless ... he has some experience, or made some study of the type of problem involved."); *Baty v. Baty*, 83 Ill.App.3d 113, 38 Ill.Dec. 516, 518, 403 N.E.2d 747, 749 (1980) (the test of competency of an expert is whether the expert discloses sufficient knowledge of the subject matter).

Based on the five patients he has observed with cataracts induced by radiation therapy, he developed his "binding universal rule" that he applied to O'Conner, thus committing the logical fallacy known as the Converse Accident (hasty generalization). The logical fallacy of Accident is the improper application of a general rule to a particular case. The logical fallacy of Converse Accident (hasty generalization) is the reverse. It occurs when a person erroneously creates a general rule from observing too few cases. Dr. Scheribel has illogically created a "binding universal rule" based upon insufficient data.

> For example, observing the value of opiates when administered by a physician to alleviate the pains of those who are seriously ill, one may be led to propose that narcotics be made available to everyone. Or considering the effect of alcohol only on those who indulge in it to excess, one may conclude that all liquor is harmful and urge that its sale and use should be forbidden by law. Such reasoning is erroneous and illustrates the fallacy of converse accident or hasty generalization.

I. Copi, *Introduction to Logic*, at 68 (3rd ed.).

When pressed by this court for the bases of his opinion he abandoned any reliance on his personal experience and relied only on medical articles (which he admitted he had not read before giving his opinion). *See* Aff. of Dr. Scheribel.

### E. Ruling on Rule 702

■ As shown by the testimony of five of the world's leading experts in the field of radiation induced cataracts (*see* Affidavits of Drs. Merriam, Cogan, Upton, Wellman and Casarett), and the testimony of plaintiff's treating ophthalmologists (*Cf.* Dr. Bond's Dep. at 17; Dr. Nelson's Dep. at 16; Dr. Ward's Dep. at 34, 6, 10, 23), this field is highly specialized and is not a part of the routine practice of ordinary ophthalmologists. It requires a demonstrated expertise, if not by experience, at least by a study of all the published literature. Dr. Scheribel has no such experience and did not even take the time to examine the published literature before giving his bald opinion. Accordingly, Dr. Scheribel is not qualified to render an expert opinion that radiation cataracts are pathognomonic or that plaintiff's cataracts could *only* be caused by radiation exposure. His testimony on this one point can be excluded on that basis alone. Fed.R.Evid. 702. Dr. Scheribel is qualified to testify on matters of general ophthalmology, such as the fact that O'Conner has posterior subcapsular cataracts. But such testimony is not sufficient to survive a motion for summary judgment on the facts of this case.

### F. Rule 703

■ An additional independent evidentiary basis exists for excluding Dr. Scheribel's opinion. An expert's opinion must have a sufficient verifiable scientific basis; the scientific data underlying his opinion must be of the type that is reasonably relied upon by experts in the field. Fed.R.Evid. 703; *United States v. Lundy*, 809 F.2d at 395; *United States v. Tranowski*, 659 F.2d at 755; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987) (where expert's opinion is not supported by scientific evidence his opinion "that it is so" is not admissible); *In Re Agent Orange*, 611 F.Supp. at 1244. "Courts are particularly wary of unfounded expert opinion when causation is the issue." *Id.* at 1249. This is especially true in cases such as this where the plaintiff claims that exposure to a toxic substance caused his injury. The court is concerned that the jury may blindly accept an expert's opinion that conforms with their underlying fears of toxic substances without carefully understanding or examining the basis for that opinion.

■ Whether an expert's opinion has a sufficiently verifiable scientific basis is an issue of law for the court to decide. *Richardson*, 857 F.2d at 833. Although an expert opinion is indispensable to a case,

> that is not to say that the court's hands are inexorably tied, or that it must accept uncritically any sort of opinion espoused by an expert merely because his credentials render him qualified to testify.

*Id.* at 829. A court has a duty "to examine the reliability of an expert's sources to determine whether they satisfy the thresh-

old established by [Rule 703]." *Christophersen*, 939 F.2d at 113 (quoting *Slaughter v. Southern Talc Co.*, 919 F.2d 304, 306–07 (5th Cir.1990)).

Such critical evaluation of the bases of an expert's opinion furthers the court's interest in providing relevant, accurate information to the jury to help it decide a fact in issue. Where the basis of an expert's opinion "is of such little weight" the jury should not be allowed to receive the opinion because such unsupported opinion "offers no expert assistance to the jury." *Viterbo*, 826 F.2d at 422; *United States v. Davis*, 772 F.2d 1339, 1344 (7th Cir.1985), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985). If the basis of the expert opinion is unsound, his conclusion is inaccurate, and the jury does not have sufficient evidence on which to decide the case. *See, e.g., Ealy v. Richardson–Merrell, Inc.*, 897 F.2d 1159, 1161–62 (1990); *Brock v. Merrel Dow Pharm. Inc.*, 874 F.2d 307, 309 (5th Cir.1989). Courts must reject opinions "founded on critical facts that are plainly untrustworthy, principally because such an opinion cannot be helpful to the jury." *Christophersen*, 939 F.2d at 1114.

In December 1989, this court entered an Order requesting plaintiff to supplement "the information that provides the basis for this opinion," that "radiation cataracts cannot be mistaken for anything else." *See* court Order dated December 22, 1989. In response, plaintiff submitted an affidavit by Dr. Scheribel which stated: "Regarding my opinion ... I rely on scientific articles such as those attached to this affidavit." In his Affidavit, Dr. Scheribel did not claim to rely on his personal experience of seeing only five cases of radiation induced cataracts as support for his opinion. Thus, he abandoned the sole basis upon which he had made his opinion because in his deposition he admitted that he had not reviewed the medical literature prior to coming to his conclusion. Dr. Scheribel attached or listed the following articles and excerpts: (1) Diseases of the Lens and Vitreous; Glaucoma and Hypotony by Duke–Elder, Vol. XI,

(1969) pages 82–83; (2) Duane, Clinical Ophthalmology, page 8; (3) Apple, Diseases of the Lens (a medline search failed to reveal any such book or article and defendants repeated requests for a copy of the article from the plaintiff have remained unanswered); [9] and (4) an excerpt of a section entitled "X–Ray and Radium Cataracts" from an unknown book by an unknown author. *See* Aff. of Dr. Scheribel at ¶ 3.

"The mere recitation of a list of studies is not a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis." *Eggar v. Burlington Northern Railroad Co.*, 1991 WL 315487, 6 (D.Mont., Dec. 18, 1991) (quoting *Carroll v. Litton Systems Inc.* No. B–C–88–253, 1990 WL 312969, 1990 U.S.Dist. Lexis 16833 (W.D.N.C., Oct. 29, 1990) (magistrates opinion adopted by district court by Order dated July 15, 1991)).

The court has examined these references and the associated affidavits and briefs and concludes that not one of these articles or excerpts supports Dr. Scheribel's opinion that a radiation induced cataract "cannot be mistaken for anything else." To the contrary, the three articles (that were attached) all stated what consensus science has discovered through years of research: posterior subcapsular cataracts have a characteristic appearance in that radiation induced cataracts are of the posterior subcapsular type, but not all posterior subcapsular cataracts are radiation induced. Duke–Elder, System of Ophthalmology, (1972) Vol. XIV, Ch. X at 994–95; Aff. of Dr. Apple at ¶ 14; Aff. of Dr. Silberstein at ¶ 22; Aff. of Dr. Apple at ¶¶ 14, 19. Dr. Scheribel's first reference to a dated 1969 edition of the Duke–Elder Series cited the wrong pages and totally missed the relevant sections pertaining to radiation induced cataracts in humans. He cited from a section in Chapter Three titled Experimental Cataract that concerns experimentally producing cataracts in animals, not in

---

**9.** A copy of the most recent request is a letter dated January 31, 1992 from Mr. Jose to Ms. Maher.

humans at all. This error is particularly egregious since the very section Dr. Scheribel cited explicitly instructs the reader to turn to the section that is directly relevant to radiation cataracts:

> A radiational cataract ... These will be discussed in the volume of Injuries where full details with the appropriate bibliographics will be found.

Duke–Elder, System of Ophthalmology, (1969 ed.), Vol. XI, Chapter III, at 81. It would appear that Dr. Scheribel never even read the pages that he cited to the court or he would have seen his error.

An examination of that relevant section directly contradicts Dr. Scheribel's opinion: "The clinical picture of a radiational cataract from whatever source it is derived is *characteristic* [not pathognomonic]." Duke–Elder, System of Ophthalmology, (1972 ed.), Vol. XIV, Chapter X, at 994–95 (emphasis added). The court notes that Duke–Elder cites to and relies upon the very studies performed by defendants' experts, Drs. Merriam and Cogan. This court finds that Dr. Scheribel misinterpreted and cited the wrong sections of the very reference upon which he himself relies. Thus, Duke–Elder does not provide a basis for Dr. Scheribel's opinion, but rather directly supports the defendants' position.

Dr. Scheribel's second reference is to Duane. The pertinent sentence from the single page attached to Dr. Scheribel's Affidavit simply says that "Other methods used to produce cataracts are radiation ... Radiation cataracts appear to be confined locally to the region of the lens receiving irradiation while the shielded region is less damaged." This statement does not support Dr. Scheribel's opinion that a radiation induced cataract is so unique in appearance that it can be clinically identified as being caused by radiation and nothing else. To the contrary, Duane only says that a radiation induced cataract is of the posterior subcapsular type which is "a very common variety." Duane, Clinical Ophthalmology, Vol. I, Chapter 72 at 16. Again, the court finds that Duane contradicts Dr. Scheribel's opinion and directly supports the affidavits of all the defense experts. Dr. Scheribel's third reference is to *Diseases of the Lens* by Apple.

Since this issue was briefed in January 1991, the "Apple" reference Dr. Scheribel was attempting to cite, and claimed to rely upon, has been located by defendants. Dr. David Apple has published, along with Dr. Rabb, a book entitled Ocular Pathology. Aff. of Dr. Apple at ¶¶ 7–9. This must be the book which Dr. Scheribel miscited as "Diseases of the Lens, Apple's by Apple." Since Dr. Scheribel's affidavit is dated January 12, 1990, he must have been referring to the 3rd edition which was published in 1985 and was the most current edition available in 1990. However, he must not have actually reviewed the book since Dr. Apple states that posterior subcapsular cataracts can be caused by many conditions and that their appearance is "identical" regardless of the cause:

> One of the most common pathologic reactions of the lens epithelium is an abnormal overgrowth, or proliferation of the equatorial cells, creating a posterior migration of the lens epithelium ... This reaction occurs in most idiopathic "senile" posterior subcapsular (cupuliform) cataracts ...
>
> *Posterior migration and bladder cell formation signify a histopathologic lesion, not a specific disease.* Therefore, such diverse conditions as senile cataract, secondary traumatic cataract, and congenital cataract associated with hyaloid vascular remnants can create an identical tissue reaction.

Apple, *supra* at 127 (emphasis in original). Thus, a radiation induced cataract is just one type of secondary traumatic cataract. Dr. Apple concluded that radiation induced cataracts are not pathognomonic and he even used italics to warn the reader that posterior subcapsular cataracts are caused by "diverse conditions" and *are not a specific disease.*" Aff. of Dr. Apple at ¶ 10. Dr. Apple himself even filed an affidavit with this court stating that Dr. Scheribel's opinion is wrong and certainly is not supported by Dr. Apple's book.

In 1991 Dr. Apple published the fourth edition of Ocular Pathology. It contains the same language on this point as the third edition except that the italics are no longer used. Apparently, Dr. Apple felt

that the point was so obvious that it no longer needed the additional emphasis.

Dr. Scheribel's fourth reference is to an attached article by an unknown author extracted from an unidentified source. Dr. Scheribel failed to provide the name of the book or pamphlet from which he copied the attachment and failed to provide a full and proper reference so that the court and defense counsel could examine the entire material in context. Even without full citation, a review of that reference shows that it too directly contradicts Dr. Scheribel's opinion and merely informs the reader that a radiation cataract is of the posterior subcapsular type. It states that: "Exposure of the eye to x-ray and radium can produce typical lens changes." (page 79). In other words, such a radiation induced cataract "can" have the appearance of a "typical" posterior subcapsular cataract such as those occurring naturally or produced by many other causes. If a radiation induced cataract has such a "typical" appearance, that hardly means that no other cataract ever has that same typical appearance. Certainly all radiation induced cataracts are of the posterior subcapsular type but one cannot make that statement backwards. It is not true that all posterior subcapsular cataracts are radiation induced, as Dr. Scheribel's proffered opinion maintains. While it is true that all men are human, it is *not* true that all humans are men. Dr. Scheribel's error in logic is just as elementary. In sum, each of his cited references fail to support his blanket assertion that a radiation cataract "cannot be mistaken for anything else." The court finds Dr. Scheribel's opinion without support in the very articles upon which he claims to rely and that he cites to the court as the basis for his opinion, as requested by this court.

Drs. Cogan, Merriam, Casarett, Silberstein and Apple each reviewed Dr. Scheribel's opinion that radiation induced cataracts are pathognomonic and each concluded that Dr. Scheribel's opinion was not supported by the medical and scientific experts in the field of radiation induced cataracts. These experts have testified as follows:

11. Dr. Scheribel's assertion that posterior subcapsular cataracts can be identified as definitely being due to radiation exposure if they have a clear area "fore and aft" of the cataract is wrong as a matter of medical science.

Aff. of Dr. Casarett at ¶ 11.

16. Although a radiation-induced cataract is of the posterior subcapsular type and usually develops a doughnut shape in its early states, not all cataracts with those characteristics are radiation-induced. It is simply not possible to look at the appearance of a cataract and determine that it could only have been caused by radiation exposure.

\* \* \* \* \* \*

20. I do not believe that the opinion which Dr. Scheribel expressed in [his evidence] deposition represents the consensus scientific and medical view of experts in radiation-induced cataracts because it does not adequately account for the factors of dose threshold, latency period and nonspecificity of morphology as identified previously in this affidavit.

Aff. of Dr. Cogan at ¶¶ 16, 20.

25. Dr. Scheribel's blanket assertion that any cataract with a clear area "fore and aft" must necessarily be radiation induced is wrong as a matter of medical science.

26. Radiation-induced cataracts often have a characteristic doughnut shape which has not been reported by Dr. Scheribel but even that morphologic state is not conclusive proof that a cataract is radiation-induced. Medical science simply cannot tell from looking at a cataract whether or not it was caused by a prior radiation exposure.

Aff. of Dr. Merriam at ¶¶ 23–26.

Dr. Edward B. Silberstein is Professor of Radiology and Medicine at the University of Cincinnati Medical Center, and he performed an extensive medical evaluation of O'Conner on January 7, 1985. Dr. Silberstein also reviewed Dr. Scheribel's opinion. Dr. Silberstein concluded:

There is no basis in medicine for Dr. Scheribel's statement that he can tell a radiation induced cataract from any oth-

er cataract because of its unique appearance.

Aff. of Dr. Silberstein at ¶ 22. Dr. Apple concluded:

13. Dr. Scheribel is wrong as a matter of medical science to claim that he, or anyone else, can tell that a certain posterior subcapsular cataract was caused by radiation just by looking at it.

15. No reasonable expert in ophthalmology would attempt to diagnose a radiation induced cataract simply by looking into a patient's eye and listening to his story about being exposed to an excessive amount of radiation.

Aff. of Dr. Apple at ¶¶ 13, 15.

This court agrees. The court finds that the "opinion" Dr. Scheribel intends to give to the jury is not only without verifiable scientific support, it is actually directly contradicted by his own claimed sources and by consensus medical science. Such a scientifically erroneous "opinion" cannot help the jury discover the truth here. It could only serve to mislead them.

■ A second independent Rule 703 basis exists for excluding Dr. Scheribel's opinion. When confronted with difficult medical questions, "courts must critically evaluate the reasoning process by which the experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them." *Brock v. Merrell Dow Pharm. Inc.*, 874 F.2d 307, 310 (5th Cir.1989), *cert. denied*, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). As the court observed in *Peterson v. Sealed Air Corp.*, 1991 WL 66370, 1991 Lexis 5333 (N.D.Ill., April 22, 1991):

In order to create a genuine issue of material fact, an expert's testimony must include a process of reasoning based on a firm foundation. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."

*Id.*, (quoting *Mid–State Fertilizer Co.*, 877 F.2d at 1339). A court that is untrained in science may not feel well suited to determine whether an expert's opinion has a valid and verifiable scientific reasoning process. But the Federal Rules of Evidence provide a helpful yardstick with which to measure and judge expert opinion testimony: would a reasonable expert in the field rely on the data and reasoning used? *Tranowski*, 659 F.2d at 755; *Lundy*, 809 F.2d at 395.

Here Dr. Scheribel originally based his opinion on only five other patients who he claims had radiation induced cataracts and on his unfounded belief that radiation induced cataracts are pathognomonic. Such a basis is scientifically insufficient to generate any "binding universal rule" and would not be relied on by a reasonable expert in the field of radiation induced cataracts for three reasons. Aff. of Dr. Silberstein at ¶ 18; Aff. of Dr. Apple at ¶ 15; Aff. of Dr. Merriam at ¶ 23.

Dr. Scheribel's limited experience with only five other patients with radiation induced cataracts cannot serve as a valid scientific basis from which to derive his "binding universal rule." *See* Aff. of Dr. Silberstein at ¶¶ 16–18; Aff. of Dr. Apple at ¶¶ 14–18. From such meager experience he created a broad, general and inflexible universal rule that *only* radiation could have caused O'Conner's cataracts. As stated earlier, Dr. Scheribel committed the logical fallacy known as Converse Accident (hasty generalization). In *Nemmers v. United States*, 681 F.Supp. 567 (C.D.Ill. 1988), *aff'd*, 870 F.2d 426 (7th Cir.1989), plaintiffs sued for injuries arising from the birth of their son, and defendant sought to introduce the expert testimony of an actuary on future economic trends. *Id.* at 577. Although the expert had training and experience as an actuary, thereby qualifying as an expert in that field, she had no education, training or experience in the particular subject on which she was to offer her opinion, *e.g.*, long-term future economic trends. *Id.* at 580. This court determined that the expert did not have a sufficient basis to render such an opinion. The court reasoned:

While personal experience may well act as a basis for a witness qualified as an expert ... personal experience alone is simply not enough, in the court's opinion, where the experience does not include some theoretical foundation.

*Id.* at 580. This court noted that the actuary had not conducted research or consulted any authorities on the subject of her proffered opinion and had no knowledge of rudimentary and essential concepts necessary for a reliable opinion. *Id.*

Here, Dr. Scheribel is trained in a particular field and has experience in that field (general ophthalmology). But his severely limited personal experience of seeing only five patients with radiation induced posterior subcapsular cataracts does not provide a sufficient foundation for a scientific reasoning process that concludes that *every* posterior subcapsular cataract *must be* caused by radiation *and nothing else.* He has "neither conducted any research, nor consulted any authorities" and admitted that he does not have even rudimentary knowledge of radiation induced diseases. Dr. Scheribel's Evidence Dep. at 22, 62, 66, 69; Dr. Scheribel's Discovery Dep. at 28–29, 41–42. His limited personal experience simply cannot provide a sufficient scientific basis upon which any scientific reasoning process can discover a "binding universal rule."

Second, Dr. Scheribel failed to assess properly O'Conner's radiation dose before concluding that the radiation caused his cataracts. Aff. of Dr. Apple ¶¶ 15–17; Aff. of Dr. Silberstein at ¶ 12. As set forth previously, any expert with even rudimentary knowledge of this field would know that radiation induced cataracts require a certain threshold dose and would carefully seek to discover the exact dose involved *before* giving a causation opinion. Dr. Scheribel did the opposite: he presumed that the cataracts were radiation induced, and then presumed that the plaintiff must have somehow been exposed to a high enough dose to exceed the threshold in order to have caused the cataracts, thereby justifying his initial diagnosis. This is circular reasoning. In *Christophersen,* the trial court excluded the opinion of an expert who testified that plaintiff's occupational exposure to nickel and cadmium fumes caused his fatal cancer. In affirming the court's decision to exclude the expert, the United States Court of Appeals, Fifth Circuit (en banc) determined that an accurate assessment of plaintiff's dose was critical to giving a reliable opinion on causation. The court stated that the facts and data relied on by the expert in assessing the dose received by the plaintiff were not the type reasonably relied on by experts in the field and therefore, "accurate dosage and exposure information was not used." *Id.* at 1113. The court explained:

> If the dosage of the harmful substance and the duration of exposure to it are the types of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate dosage or duration data.

939 F.2d at 1114.

An expert in radiation induced cataracts would require knowledge of a patient's radiation dose *before* finding causation. He would not rely only on the story told by the patient to determine the patient's radiation dose. Rather, the expert would review the patient's actual dosimetry records, and examine (or perform) the appropriate medical tests to determine the dose received. Aff. of Dr. Apple at ¶ 16; Aff. of Dr. Silberstein at ¶ 12. He would also review the scientific literature to learn the threshold dose of radiation and minimum latency period required to cause cataracts. As Dr. Silberstein explained:

> 12. The proper medical methodology used by any reasonable expert in the field to assess a claimed dose of 400 rem includes: obtaining an accurate history from the patient, obtaining copies of the dosimetry records for the individual, performing a whole body count to check for internal deposition of radionuclides, obtaining the patient's medical records from the weeks after the claimed incident so that the blood counts can be checked for a reduced lymphocyte count, obtaining a current blood sample and checking it for increased chromosome aberrations, examining his medical records for evidence of the acute radiation syndrome which would occur within a day of a dose of 400 rem, and examining his work records to see if he was able to

work in the days following the alleged exposure.

\* \* \* \* \* \*

15. By the time that Dr. Scheribel gave his Opinion in this case at his Evidence Deposition on June 10, 1988, all this work performed by our laboratory in assessing Mr. O'Conner's dose had been in existence for about four years yet he failed to ask for, obtain or use any of this essential data in performing his analysis.

16. I have reviewed a copy of Dr. Scheribel's Evidence Deposition and a copy of his Affidavit dated January 12, 1990.

17. The methodology which Dr. Scheribel used to come to his opinion of causation in this case is to first uncritically accept what Mr. O'Conner told him about receiving a high dose and then to assume that radiation induced cataracts are pathognomonic.

18. Both parts of Dr. Scheribel's methodology are errors and are not a methodology which any reasonable expert in radiation doses or radiation effect on humans would use.

. \* \* \* \* \* \*

26. What Dr. Scheribel did in this case is not a differential diagnosis. By its very name differential diagnosis requires the physician to acquire all of the evidence, to consider all of the evidence acquired, to consider all of the possible diseases, and then to use this data to make the best diagnosis on the facts of an individual case. Dr. Scheribel did no such thing in this case. He failed to follow the methodology, as described above, which any reasonable expert in this field of medicine would follow, before attempting to make a differential diagnosis as to whether a certain cataract was radiation induced.

Aff. of Dr. Silberstein at ¶¶ 12, 15, 16–18, 26. *See also,* Aff. of Dr. Merriam at ¶¶ 23–24 where he states:

23. ... Dr. Scheribel did not follow the method of analysis which would be reasonably relied upon by an expert in radiation-induced cataracts.

24. ... Dr. Scheribel failed to require some objective evidence of dose, he failed to research the threshold dose for cataractogenesis, he failed to account for the long latency period necessary for a dose of even 200 rem, and he failed to realize that posterior subcapsular cataracts are rather common in men aged 40 through 49.

Commonwealth Edison maintained extensive dosimetry records, which were available for examination. Blood samples were taken within four weeks of the alleged exposure. If the plaintiff's dose had been over 100 rem, his absolute lymphocyte count would have been less than 1000. O'Conner's actual lymphocyte count was 2,105, well within normal limits "indicating that his radiation exposure is not what he claims." letter by Dr. Edward B. Silberstein dated April 2, 1985, a copy of which is attached as Exhibit 2 to Dr. Silberstein's Affidavit. A second test to determine O'Conner's dose was performed at Oak Ridge National Laboratory. This test analyzed his chromosomes and ruled out a dose of any more than 25 rads, which is the lower limit of sensitivity of this test. *See* Chromosome Analysis of Blood Sample by Dr. R. Julian Preston *and* Aff. of Dr. Silberstein at ¶ 23. The proper methodology for determining whether O'Conner received radiation exposure sufficient to cause cataracts is set forth in Dr. Silberstein's Affidavit at ¶ 12 and Dr. Apple's Affidavit at ¶ 16.

The court finds that Dr. Scheribel's opinion is based on critically incomplete and grossly inaccurate dose data. Dr. Scheribel never attempted to assess O'Conner's dose and admitted that he did not know O'Conner's dose when he gave his opinion. Dr. Scheribel's Evidence Dep. at 63. Instead, he relied on O'Conner himself, who told Dr. Scheribel "that he had cataracts caused by a radiation exposure in October of 1983." Dr. Scheribel's letter to attorney Kenneth D. Peters dated June 27, 1985; Dr. Scheribel's Evidence Dep. at 23. Each of O'Conner's actual test results were in existence and available to Dr. Scheribel when he examined O'Conner in May, 1985. Aff. of Dr. Silberstein at ¶ 14. However, he did not examine the dosimetry records, did not review the blood test results, did not review the chromosome analysis, and

did not review the relevant scientific literature. Dr. Scheribel's Evidence Dep. at 69.

Third, an expert would not reasonably rely on the mere presence of posterior subcapsular cataracts to opine that such cataracts were radiation induced. Aff. of Dr. Silberstein at ¶ 17; Aff. of Dr. Apple at ¶¶ 14, 15. The reliable expert would know (or at a minimum discover), based on even a cursory review of the appropriate medical literature, that radiation induced cataracts have a characteristic appearance, but that not all cataracts with such characteristic appearance are caused by radiation, there being numerous other causes. Aff. of Dr. Apple at ¶ 14. An expert would attempt to rule out each other possible cause of posterior subcapsular cataracts. By making such inquiries the expert would learn the true dose received, realize that the dose was insufficient to cause cataracts, and investigate other more likely causes for O'Conner's cataracts. Aff. of Dr. Silberstein at ¶ 26.

 Just as a medical opinion without a verifiable scientific basis is inadmissible, an expert opinion that *actually contradicts directly* the scientific consensus is inadmissible. *See Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159, 1162 (D.C.Cir.1990) ("[A]n opinion refuting ... scientific consensus is inadmissible for lack of an adequate foundation"); *accord, In Re Agent Orange,* 611 F.Supp. at 1242. *See also, Lynch v. Merrell–National Laboratories,* 830 F.2d 1190 (1st Cir.1987).

 Without citing any case authority, plaintiff attempts to avoid the stringent requirements of Rule 703 by claiming that there is a distinction between a treating physician and a "nontreating expert hired for litigational purposes." Plaintiff concludes that "the testimony of a treating physician ... should not be evaluated in light of Rule 703." However, even under Illinois state law, that assertion is clearly wrong. In adopting Federal Rule of Evidence 703, the Illinois Supreme Court stated:

> [W]e believe that Federal Rule of Evidence 703 ... makes no distinction between the opinions of treating and nontreating doctors ... the key element in

applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is reliable. *Wilson v. Clark,* 84 Ill.2d 186, 49 Ill.Dec. 308, 312, 417 N.E.2d 1322, 1326 (1986). At oral argument plaintiff asserted that a treating physician who testifies as an expert must be treated differently than a "Rule 220 expert under Illinois Civil Practice," in that they do not fall under Rule 702 and 703. Tr. of Oral Argument, Jan. 17, 1992 at 4–5. This court asked for case authority on that point. Tr. at 25. Plaintiff's brief failed to provide any such authority. Perhaps plaintiff was confused by Illinois Supreme Court Rule 220 governing disclosure of the identity of an expert hired to testify at trial, in contrast to disclosure of treating physicians.

### G. Ruling on 703

 Having exercised its duty mandated by Rule 703 to examine the basis of expert opinion testimony and the reasoning process used, the court finds that Dr. Scheribel's opinion has no verifiable scientific basis and no verifiable scientific reasoning process.

The court further finds that Dr. Scheribel's opinion directly contradicts consensus science. Aff. of Dr. Apple at ¶ 13 ("Dr. Scheribel is wrong as a matter of medical science to claim that he, or anyone else, can tell that a certain posterior subcapsular cataract was caused by radiation just by looking at it."); Aff. of Dr. Silberstein at ¶ 18 ("There is no basis in medicine for Dr. Scheribel's statement that he can tell a radiation induced cataract from any other cataract because of its unique appearance."); Aff. of Dr. Cogan at ¶ 25 ("Dr. Scheribel's blanket assertion that any cataract with a clear area "fore and aft" must necessarily be radiation induced is wrong as a matter of medical science."); Aff. of Dr. Casarett at ¶ 11 ("Dr. Scheribel's assertion that posterior subcapsular cataracts can be identified as definitely being due to radiation exposure if they have a clear area "fore and aft" of the cataract is wrong as a matter of medical science."); Aff. of Dr. Merriam at ¶¶ 23–26 ("Medical science simply cannot tell from looking at a cataract

whether or not it was caused by a prior radiation exposure."). Therefore, his opinion is more dangerous than an opinion lacking a verifiable scientific foundation. The court therefore finds that Dr. Scheribel's opinion must be excluded under Rules 703 and 403.

## H. The *Frye* Test

*Frye* is not a rule but an evidentiary doctrine incorporated into Federal Rules of Evidence 702 and 703 by this Circuit that is designed to test the reliability of scientific evidence. *See United States v. Carmel,* 801 F.2d 997, 998–99 (7th Cir.1986) ("This Circuit ... has reaffirmed the *Frye* standard subsequent to the passage of the Federal Rules of Evidence") (citing *United States v. Tranowski,* 659 F.2d 750, 754–57 (7th Cir.1981)). It has been applied by the courts of this Circuit in both criminal and civil cases. *See, e.g., United States v. Carmel; Grove Fresh Dist., Inc. v. New England Apple Prods. Co.,* 1991 WL 169058 (No. 89C1115) (N.D.Ill., Aug. 27, 1991). Part and parcel of the law interpreting the Federal Rules of Evidence, the *Frye* doctrine applies in all proceedings before the courts of this Circuit, both federal question and diversity. *See* Fed.R.Evid. 101; C. Wright, A. Miller & E. Cooper, 19 Federal Practice and Procedure § 4512 ("If a Rule of Evidence covers a disputed point of evidence, the Rule is to be followed, even in diversity cases, and the state law is pertinent only if and to the extent the Rule makes it so.").

Plaintiff's contention that the direction of the Price–Anderson Act to apply certain state law somehow changes this is without merit. The Federal Rules of Evidence govern the admissibility of an expert's testimony in the federal courts. *See Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 825 n. 9 (D.C.Cir.1988), *aff'd,* 857 F.2d 823 (D.C.App.), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989); *Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159, 1163 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 370, 112 L.Ed.2d 332 (1990). Hence, unless the Price–Anderson Act was intended to supplant the Federal Rules of Evidence, admissibility of scientific evidence through opinion testimony will be governed by those Rules, even if substantive rights are affected. *See, e.g., Bushman v. Halm,* 798 F.2d 651, 660 n. 11 (3rd Cir.1986); *c.f., In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 353 (E.D.Pa.1976) (any modification of existing substantive rights which may be caused by application of Fed.R.Evid. 703 and 403 cannot be avoided because these rules "result[ ] from ... congressional enactment ... and not from any exercise of the United States Supreme Court's power to promulgate rules of procedure.").

This case is subject to the Price–Anderson Act. *O'Conner v. Commonwealth Edison Co.,* 748 F.Supp. 672, 673 (C.D.Ill.1990); *O'Conner v. Commonwealth Edison Co.,* 770 F.Supp. 448 (C.D.Ill.1991). Although that Act expressly reserves application of state substantive law, it does not limit the applicability of the Federal Rules of Evidence here. Nor does it limit application of federal case law interpreting those rules. Thus, the court finds that the *Frye* doctrine must be applied here.

Even the state courts of Illinois would apply *Frye* here. *See People v. Jordan,* 103 Ill.2d 192, 82 Ill.Dec. 925, 932, 469 N.E.2d 569, 576 (1984); *People v. Ferguson,* 172 Ill.App.3d 1, 122 Ill.Dec. 266, 271–72, 526 N.E.2d 525, 530–31 (2nd Dist.1988). Illinois Supreme Court Rule 220(a)(1) provides in pertinent part:

> An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial.

Rule 220(a)(1). The burden of establishing the expert's qualifications rests on the proponent of his testimony. *Jordan,* 103 Ill.2d 192, 82 Ill.Dec. at 932, 469 N.E.2d at 576; *People v. Leahy,* 168 Ill.App.3d 643, 119 Ill.Dec. 230, 234, 522 N.E.2d 892, 896 (2nd Dist.1988). The qualification of an expert is within the sound discretion of the trial court. *Harris v. Granite City,* 8 Ill.Dec. 648, 52 Ill.App.3d 782, 785, 365 N.E.2d 1034, 1037 (5th Dist.1977); Graham, M.

Cleary & Graham's Handbook of Illinois Evidence § 702.2 at 494–95. Thus, under state law, as under the federal rules, an expert must be qualified as an expert before giving expert opinion.

Further, the Illinois Supreme Court has adopted Federal Rule of Evidence 703 and, by inference, decisional law of this Circuit interpreting that rule. *Wilson v. Clark*, 84 Ill.2d 186, 49 Ill.Dec. 308, 417 N.E.2d 1322, *cert. denied*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981). Therefore, under state evidence law, the *Frye* doctrine must be applied; an expert must have a verifiable scientific basis for his opinion. Consequently, whether this court applies the Illinois Rules of Evidence or the Federal Rules of Evidence, the same analysis and result will obtain: unless Dr. Scheribel's proffered opinion passes the scrutiny of Rule 703 and *Frye*, it is not admissible.

Under *Frye*, the methodology and reasoning used by an expert to reach his conclusion must be generally accepted within the relevant scientific community. *United States v. Smith*, 869 F.2d 348, 351 (7th Cir.1989); *Tranowski*, 659 F.2d at 756; *Christophersen*, 939 F.2d at 1113; *Frye*, 293 F. at 1014; *Mercado v. Ahmed*, 756 F.Supp. 1097, 1102 (N.D.Ill.1991). Plaintiff erroneously argues that *Frye* does not apply to this case because it was "decided prior to the enactment of the Rule [sic] of Evidence" and because it is "absent from the advisory committee notes." Plaintiff's Brief at 10. However, the vitality of *Frye* is well established in the Seventh Circuit. *See United States v. Smith*, 869 F.2d 348, 351 (7th Cir.1989); *United States v. Carmel*, 801 F.2d 997, 999 (7th Cir.1986); *Tranowski*, 659 F.2d at 756. Moreover, none of the cases that employ the *Frye* analysis

limit its application to "criminal" cases as suggested by plaintiff. Thus, plaintiff's attempt to distinguish *Frye* is without merit.

Although generally an expert's conclusion may be admissible even when it is controversial or unique, it is not admissible when scientific truth has "so completely hardened as to prevent legitimate difference of true expert opinion in a particular concrete field." *Christophersen* 939 F.2d at 1111, n. 8 (quoting *Osborne v. Anchor Laboratories, Inc.*, 825 F.2d 908, 915 n. 10 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988)).

### I. Ruling on *Frye*

Here, Dr. Scheribel's opinion is based on an underlying erroneous opinion that radiation induced cataracts are pathognomonic. This "binding universal rule" is not accepted by scientists who specialize in the field of radiation induced cataracts. Aff. of Dr. Apple at ¶ 13; Aff. of Dr. Silberstein at ¶ 22; Aff. of Dr. Casarett at ¶ 11; Aff. of Dr. Cogan at ¶¶ 24–25; Aff. of Dr. Merriam at ¶¶ 22–26. Moreover, he has never proved the reliability of his dogmatic assertion, never having performed (or even reviewed) any studies on the subject. His opinion is further flawed because he did not consider the numerous variables that should have been considered in determining cause. For example, he did not consider all of the other conditions [10] in O'Conner's medical history that made it more likely that his cataracts resulted from those conditions rather than the minute radiation exposure that the record reflects he received, especially the fact that O'Conner's father also developed posterior subcapsular cataracts at the age of 39.[11]

---

10. Many conditions can cause posterior subcapsular cataracts. Among the many conditions that can cause them (and that are applicable to Mr. O'Conner) are congenital and hereditary factors, eye trauma, cortisone, prednisone, obesity, drugs prescribed for hypertension, sunlight, galactosemia, prolonged use of eye drops, chronic diarrhea and elevated triglyceride levels. Aff. of Dr. Apple at ¶ 12; Aff. of Dr. Merriam at ¶¶ 19; Dr. Bond's Dep. at 17; Dr. Nelson's Dep. at 23, 29, 32, 47; Dr. Ward's Dep. at 15–16, 18–19, 21–22, 29–30; Dr. Reardon's Dep. at 19–21.

11. *See* Aff. of Dr. McGrath attached to Supplement to Defendants' Reply to Plaintiff's Motion in Limine to Exclude Evidence or Reference to Dr. Philip McGrath or Plaintiff's Father's Eye Condition; Dr. O'Brian's Dep. at 52–53; Aff. of Dr. Cogan at ¶ 21; Aff. of Dr. Merriam at ¶ 17. Having a relative who develops cataracts at such a young age greatly increases the likelihood of developing early cataracts. Aff. of Dr. Cogan at ¶ 23; Aff. of Dr. Merriam at ¶ 20; Dr. Bond's Dep. at 17. Yet, Mr. O'Conner did not reveal this very significant fact to Dr. Scheribel who then failed to consider such an important predisposing factor before concluding that only

In *Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333 (7th Cir.1989), plaintiff filed an affidavit by an expert that had no reasoning for the conclusions it contained. In affirming the trial court's granting of summary judgment, the appellate court observed that a court should not rely on an expert opinion that an expert "would not tolerate in his professional life." *Id.* at 1339. *See also Johnston*, 597 F.Supp. at 410 (if expert's opinion was given to "anyone other than a jury or this court he would become an immediate laughing stock!"). The court stated that "Judges should not be buffaloed by unreasoned expert opinions," and concluded:

> Ukase [an edict] in the guise of expertise is a plague in contemporary litigation. "The importance of safeguarding the integrity of the [judicial] process requires the trial [or appellate] judge, when he believes that an expert's testimony has fallen below professional standards, to say so, as many judges have done." [Citations omitted]. Professor Bryan cast aside his scholar's mantle and became a shill for [the plaintiff]; Judge Hart, by observing that the emperor had no clothes, protected the interests of the judicial system.

*Mid–State Fertilizer Co.*, 877 F.2d at 1340. *See also Johnston*, 597 F.Supp. at 411 (rejecting experts "because they have become advocates for a cause and have therefore departed from the ranks of objective expert witnesses"). Each expert in the field of radiation induced cataracts, including Dr. Apple, on whose work Dr. Scheribel claims to rely, has testified that Dr. Scheribel's reasoning and methodology are not accepted in the scientific community.

## IV. EFFECT OF INADMISSIBILITY ON DUTY OWED

### A. The Standard of Care Owed

██ As has been determined previously by this court, the standard of care that a public utility licensee owes to radiation workers like O'Conner is to keep their radiation exposures from exceeding the permissible dose limits that have been established by the federal regulators. *O'Conner v. Commonwealth Edison Company*, 748

F.Supp. 672 (C.D.Ill.1990). Dose is a subject requiring expert testimony because it is well beyond the knowledge and expertise of any average person. The heart of Dr. Scheribel's testimony is that only radiation exposure received at Quad Cities could have caused plaintiff's cataracts. This opinion is inadmissible and medically invalid. Without it plaintiff has no expert opinion testimony or other admissible evidence from which a reasonable jury could even infer that O'Conner received a dose above the standards.

Plaintiff's allegation that, at times, doses were misrecorded is insufficient to supply the necessary exposure testimony because it is not expert testimony, it is not specific to his dose on the night of the alleged incident (October 3, 1983), and it does not establish that his dose *exceeded* the federal permissible dose limits. It remains only an allegation that is insufficient to forestall summary judgment under Rule 56(e). Nor does the testimony of Jessie Wilson supply what is missing here: admissible expert opinion testimony that plaintiff's dose exceeded the federal permissible dose limits. Mr. Wilson's testimony is only that on one occasion in 1981, two years before the alleged incident, at a time when O'Conner was not even employed at Quad Cities, a technician made a mistake in recording Mr. Wilson's daily SRPD reading and promptly changed it when Mr. Wilson called it to his attention. Mr. Wilson's Dep. at 65. This isolated incident is insufficient, taken alone or together with the rest of plaintiff's evidence in the record, to give rise to a reasonable inference that the radiation dose he received at Quad Cities exceeded the federal permissible dose limits.

Although on the surface Dr. Scheribel's opinion at issue here seems to be a causation opinion, it is also a medical opinion which serves, if admissible, as the only basis upon which the plaintiff can argue an inference of breach of the duty owed. Since it is not admissible under Rule 702, Rule 703 or *Frye*, if plaintiff is unable to offer any other expert opinion testimony that his dose exceeded the 12 rem per year

radiation could have caused Mr. O'Conner's cataracts. Dr. Scheribel's Discovery Dep. at 23.

(or 3 rem per calendar quarter) permissible dose limits, summary judgment must be granted to the defendants on the duty owed issue. Of course, Dr. Scheribel is not an expert on dosimetry and therefore, is not qualified to give any opinion on dose and, as shown above, his erroneous "binding universal rule" is not binding, is not universal, is not a rule, and is not admissible.

**B. The Other Evidence Plaintiff Offers**

O'Conner has not been able to offer any testimony by a qualified witness that his dose exceeded the permissible dose limits. Plaintiff's only dose expert is Dr. Martin Welt. Counsel for plaintiff took Dr. Welt's Evidence Deposition on March 17, 1989 because Dr. Welt was scheduled to be incarcerated in a federal prison at the time this case was originally scheduled for trial. Dr. Welt's Dep. at 176–77. Dr. Welt admitted at that deposition that he had been convicted in federal court of (1) participating in a conspiracy to defraud the United States, and to lie to the NRC; (2) causing a food irradiation plant to be operated by defeated safety interlocks; (3) causing others to lie to the NRC; (4) lying to NRC investigators; and (5) preparing a false, backdated document. Dr. Welt's Dep. at 173–76. Dr. Welt testified that it is "highly unlikely" that O'Conner received the dose he represented to his doctors, that the maximum dose he could have received was only 50% more than the dosimeters recorded, and that there was no violation of the standard of care here:

Q. You indicated in your direct examination, that you agreed that it's highly unlikely that Mr. O'Conner got the 300 or 400 rads of exposure that he told his doctors that he received.

A. That is correct.

Dr. Welt's Dep. at 47.

Q. On July 5th 1988 you wrote a letter to Mr. Janssen which contained your opinion on the dose which Mr. O'Conner received. Isn't that correct?

A. Correct.

Q. And in that area you indicated that this dose was as recorded by the measuring devices plus 50%, correct?

A. Right. I said that would be the maximum of the limit.

Q. Do you stand by that?

A. Yes.

Dr. Welt's Dep. at 55–56.

Q. Do you believe that the radiation safety officer violated the standard of care by allowing Mr. O'Conner to receive the 45 millirem dose [.045 rem] recorded by his self-reading pocket dosimeter?

A. No.

Dr. Welt's Dep. at 49.

The limits of Dr. Welt's opinion are clear. Even if O'Conner received 50% more than his dosimeters actually measured, his dose would not exceed 3 rem per calendar quarter or 12 rem per year. Dr. Welt's opinion does not get O'Conner past the duty owed. No reasonable jury could conclude on this evidence that the plaintiff has proven a violation of the duty owed.

**C. Conclusion on Duty Owed**

After seven years of extensive litigation, plaintiff has been unable to offer any admissible evidence upon which a reasonable jury could conclude that the dose of radiation which he received at Quad Cities was sufficient to have violated the duty owed. Indeed, the only reasonable conclusion which a jury could reach upon the evidence presented in this case is that his dose of radiation was well within the duty owed. Since plaintiff, after adequate time for discovery, has failed to make a showing sufficient to establish the existence of an element (breach of duty owed) essential to his case, Rule 56(c) mandates the entry of summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**V. EFFECT OF INADMISSIBILITY ON CAUSATION**

**A. The Standard**

 To prove causation, plaintiff must introduce expert testimony to a reasonable degree of medical certainty that his alleged

injuries were caused by his radiation exposure. *Warner/Elektra/Atlantic Corp. v. County of DuPage*, 762 F.Supp. 784, 788 (N.D.Ill.1991); *McCord–Shell v. Volkswagen of America, Inc.*, 736 F.Supp. 172, 173–74 (N.D.Ill.1990).

### B. The Other Evidence Plaintiff Offers

No other medical witnesses offered by the plaintiff have testified based on an adequate factual or scientific foundation with a reasonable degree of medical certainty that O'Conner's cataracts were caused by radiation. During the course of this case, plaintiff has consulted with and has been evaluated by at least four other ophthalmologists, Drs. William Bond, Robert Reardon, John Nelson and Clarence Ward. Consistent with consensus science, each of these four physicians testified in agreement with defendants' experts that radiation induced cataracts are not pathognomonic but rather, only are characteristic.

No other medical witnesses offered by the plaintiff have testified with a reasonable degree of medical certainty that O'Conner received any other physical injury as a result of his radiation exposure. However, in addition to alleging that radiation exposure caused his cataracts, plaintiff alleged, but failed to substantiate with expert testimony, that the radiation exposure caused his bones to have contractions; a groin rash; difficulty staying awake; diarrhea for over one year; "borderline leukemia;" difficulty breathing; his fingernails to become powdery and break off; his hair to fall out; and elevated triglyceride levels. O'Conner's Dep. at 50, 53, 55; Plaintiff's Pre-trial Memorandum at 6. His physician, Dr. Bullock has testified that:

There were no clinical tests that I made that showed abnormalities.

Dr. Bullock's Dep. at 36.

Q. So your impression ... is based only upon what he told you and what he reported in the history to you?

A. Yes.

Dr. Bullock's Dep. at 35–36. Dr. Ichtertz has testified:

Q. With regard to Mr. O'Conner's pulmonary complaints ... are you treating other patients with those same symptoms who have not been exposed to radiation?

A. Sure. Many of them. It's common symptoms.

\* \* \* \* \* \*

Q. And based on what Mr. O'Conner told you ... it was because of that that you attributed his pulmonary complaints and problems to radiation exposure, isn't that true?

A. That's correct.

Dr. Ichtertz's Dep. at 24–25. Dr. LeGrand has testified:

A. ... I must admit to be fair to say that I was not able to determine by my examination on a consistent basis any clinical evidence of significant either acute or chronic changes one might see with radiation exposure.

Dr. LeGrand's Dep. at 21.

A. I was never able to find any significant evidence of bronchial spasm ... He had indicated to me that at times he was breathless, but he admitted that he was relatively sedentary ...

Dr. LeGrand's Dep. at 13.

Without question, the most thorough and skilled medical examination that was performed on O'Conner in an attempt to detect any possible physical effects of his alleged "radiation overexposure" was the complete work-up performed by Dr. Edward B. Silberstein at the E.L. Saenger Radioisotope Laboratory. Dr. Silberstein concluded:

While the sensitivity of presently existing biological testing cannot eliminate the possibility that Mr. O'Conner was exposed to a dose below 25 rem, there is no medical evidence to suggest that he received a dose greater than the dose recorded by his film badge ... His own blood proves that he did not get a dose of 400 rem as he claims. The dose which he did receive had no visible biological effect upon him which medical testing could demonstrate.

Aff. of Dr. Silberstein at ¶ 23. Plaintiff has failed to provide any evidence of any adverse medical effect from his exposure to occupational levels of radiation below the federal permissible dose limits. No reasonable jury could conclude otherwise.

### C. Conclusion on Causation

After seven years of extensive litigation and numerous medical examinations, plaintiff has been unable to make a sufficient showing to establish the existence of an element (causation) essential to his case. The only reasonable conclusion a jury would come to is that his dose was about 4444 times too small to have caused his cataracts. Consequently, on causation, as well as on duty owed, entry of summary judgment is mandated for the defendants. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### VI. CONCLUSION

In sum, the court GRANTS the defendants' Motion to Exclude the indicated portions of Dr. Scheribel's testimony and also GRANTS the defendants' Motion for Summary Judgment on the basis that the evidence then remaining in this case is insufficient to establish the existence of elements (breach of duty and causation) essential to plaintiff's case and upon which plaintiff will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The Clerk is directed to enter judgment for the defendants and against plaintiff on all claims.